# CIRCUIT COURT OF BALTIMORE CITY

Filed December 1, 1893.

EDWARD C. HALL

VS.

JOHN F. WAGGERMAN ET. AL.

WICKES, J.—

The plaintiff, Edward C. Hall, has filed his bill in this Court for the purpose of compelling the defendant, Waggerman, and incidentally the other defendants, to transfer to him a certain interest in the Emerson Drug Company, to which he considers himself entitles under a contract entered into between himself and Waggerman in April, 1890. Briefly stated, the circumstances were these:

The defendant, Dr. Emerson, had patented a formula for an article called "Bromo Seltzer," and was engaged in the manufacture and sale of it, at the time the contracts were made under which this controversy arises. He does not seem to have been in much need of money to develop his business, because he had already an offer of a large amount by parties who were willing to contribute it, upon condition that they could get a controlling interest, which Emerson was unwilling to sell them.

The plaintiff, however, called the defendant Waggerman's attention to it, and after several interviews, articles of co-partnership were entered into between Emerson and Waggerman, Hall being instrumental in bringing about the arrangement, and receiving from Dr. Emerson $300 for his services. Waggerman lived in Washington, and Hall's wife was his cousin; there was personal intimacy between Hall and Emerson, and also between Hall and Waggerman. The articles of co-partnership between Emerson and Waggerman were signed on the 16th of April, 1890. The contract between Hall and Waggerman bears date the 17th of April, 1890, but there is evidence to show that it was really not executed until some time later. By the sixth article of the co-partnership agreement it was stipulated that "Emerson is to manage the business and devote his whole time and attention to it," and receive a certain sum for so doing "until said Waggerman shall find a man suitable to both partners to solicit trade, and attend to said business" when Emerson's salary was to cease. The eighth article provides, among other things, that "said Waggerman being non-resident, it is agreed that Edward C. Hall, of Baltimore City, shall act as his agent, &c." "and in all matters relating to said partnership represent him with his partner until such time as the said Waggerman shall revoke the authority hereby given by written notice to his said partner."

Waggerman was to contribute $10,000 to the business in installments at such periods as are named in the contract.

Following this the contract in controversy between Waggerman and Hall was signed.

It recites the formation of the partnership between Emerson and Wag-

german and the terms upon which Waggerman enters the firm, and that in consideration of Hall's services to be rendered Waggerman agrees "out of the net profits of said partnership business and receipts to pay said party of the second part (Hall) one hundred dollars per month and to give him one-fourth interest in said business, subject to the reimbursement to said party of the first part (Waggerman) of said sum of $10,000, cash outlay and said sums of $100 per month before said party of the second part (Hall) draws any of the net profits of said one-quarter interest, and after said party of the first part shall have been reimbursed, said sum of $10,000, and said sums of $100 per month from the net profits of said business, then he is to pay said party of the second part one-quarter of the net profits of said business in the same manner as if he were equal partner with said party of the first part, provided said party of the second part (Hall) is deemed by said The Emerson Drug Company suitable for said position, and provided that if at any time the said party of the second part shall so neglect or mismanage or act in said business and his services thereto, as to incur the dissatisfaction of said firm, then this agreement, upon thirty days notice to said party of the second part from said firm, shall terminate as to said salary, employment and also as to any further interest in said firm; and said party of the second part *shall have no other future interest in said business or under this contract.* He shall have the right, however, to receive from the party of the first part whatever amount may be due him from his one-quarter interest in said business, based upon any reduction out of the net profits of said business, of said $10,000, and reimbursement of said $100 per month to said party of the first part, calculated upon the theory that the said party of the second part has a one-quarter interest in said business, subject to the aforesaid prior claim or lien of said party of the first part for reimbursement of his aforesaid outlay." Hall agreed to give his "whole time and attention and utmost skill and faithfulness to the promotion of said business" * * * "as canvasser, commercial traveler and salesman, and also under the direction of the party of the first part to exercise supervision over the books and accounts and inner office workings of said firm." Waggerman reserved the right to sell one-half of the interest which he and the party of the second part have," in event of not being able to pay the whole sum of $10,000, as required by his agreement with Emerson, and in the event of such sale said party of the first part shall settle with said party of the second part *any amount due him under the terms of this agreement.*"

It can scarcely be pretended that Hall became a member of the firm, or a partner by virtue of this agreement. It is a mooted question in the case whether Dr. Emerson even knew of the existence of this contract at the time Hall entered their service, or at any time during his continuance in it, for while Hall affirms that he did, and gives in evidence certain conversations with himself and others to show that he did, Dr. Emerson himself swears that he knew nothing of it at the time or until long afterwards.

It would be very important to ascertain this fact if there was evidence of fraud, collusion or bad faith on the part of Waggerman and Emerson in discharging Hall from their service. But I find nothing that can possibly lead to such a conclusion.

It does not therefore seem to be very material, whether Emerson knew of the contract between Waggerman and Hall or not, although much stress was laid upon it at the argument by the learned counsel for the complainant.

Hall seems to have been the confidential agent of Waggerman with authority to act for him, under his direction in any matter pertaining to the business—a function he seems never to have been called upon to exercise. He was also created a salesman for the house, and in this capacity he entered upon his duties about the first day of May, 1890. Hall made three trips under this employment, and according to Dr. Emerson testimony failed on each occasion to give him satisfaction. Hall alleges the contrary, and produces in evidence a number of letters to show that Emerson commended him and expressed satisfaction with him.

But I think the testimony shows that on the whole, and especially toward the close, that Emerson was not satisfied with Hall's large expenditures of

money or methods of transacting business. Whether these expenditures were in excess of such other salesmen for other houses engaged in a different business made, is not the question—the fact is that Emerson, the active partner in charge of the business was highly displeased, and after the third trial, insisted upon his discharge.

Waggerman, who alone of the firm could profit by the discharge, interceded on several occasions to keep Hall in his position, but at last according to his testimony and that of Dr. Emerson, he concurred in the discharge of Hall from their employment, and about the first of September, 1890, he was told that his services would not be longer needed, but that his salary would be paid up to October first.

I cannot acquiesce in the contention of the plaintiff, that his employers were bound to satisfy him or any other person of the reasonableness of their action. Under the terms of his engagement, they and they alone were the judges of their own satisfaction or dissatisfaction with him.

The law seems to be well settled on this subject.

In Rossiter vs. Cooper, 23 Vermont 522, there was a contract for a years service, provided among other things that if the employee (the plaintiff) should become dissatisfied and wish to leave the defendant's service he might do so on fourteen days' notice. Plaintiff quit at the end of six months and brought suit for six months' wages. The Court said he was under no legal obligation to appraise the other party of the ground of his dissatisfaction. "The plaintiff was at liberty at any time when he became dissatisfied to terminate the contract, although he might have no satisfactory reason for such dissatisfaction." In Spring vs. Ansonia Clock Company, 24 Hun. 175, the plaintiff agreed to work for the company one year, provided among other things his work and services shall be to their satisfaction. The Court said "the employment of the plaintiff was only to continue during the pleasure of the defendants, and that the latter might discharge him at any time without assigning any reason therefor. Plaintiff insists that under the contract some cause should have been assigned for his dismission, and that the contract bestowed in the defendants

no power to discharge him without the assignment of a reason. We cannot yield assent to such construction. * * * The determination of the question whether the services of the plaintiff under this contract was satisfactory, belongs entirely to the company, subject to no control from the Courts. The will of the company is the only tribunal to which the question can be referred." In Tyler vs. Ames, 6 Lansing, 280, the Court says, "the word 'satisfactorily' refers to the mental condition of the employer, not the mental condition of a Court and jury." In Burk vs. Kole, 29 Pacific Rep. 919, recently decided, where a written contract of employment for a year required the servant to render "good and satisfactory service," it was held "the employer has the sole right to determine the character of such service, and his testimony that he is not satisfied is decisive, as against evidence that he ought to have been satisfied." These and numerous other cases, to which I need scarcely refer, seem to decide fully the right of Emerson & Waggerman to discharge Hall, without assigning cause for their act, although much testimony has been taken to show that he gave them abundant reason for getting rid of him.

But the plaintiff insists that Waggerman was not present when he was dismissed by Dr. Emerson, and never concurred in his discharge. That Dr. Emerson acted in the matter is not disputed.

It is Waggerman's concurrence that is denied.

As against Hall's testimony we have the positive testimony of both members of the firm that both concurred in this action. Dr. Emerson seems to have been entirely disinterested at that time as between Waggerman and Hall. He had nothing apparently to lose or gain by retaining or dismissing Hall, except so far as the business of the house suffered from what he thought was the inefficiency and misconduct of their traveling salesman. So I do not see how we can fail to find the decided weight of the evidence in favor of the conclusion that the discharge of Hall was the joint action of the firm. But it is said, Waggerman's conduct and declarations afterward to Hall and members of his family, and certain letters which have been produced in

evidence, all go to show that Waggerman never intended that Hall should lose his interest in the business under the contract, whatever may have been his willingness to part with Hall's· services as a traveling agent. Special reference is made to an account he opened between Hall and himself, called on his books the "Bromo Seltzer account." In this were entered advances of money he made to' Hall during the fall of 1890, when Hall and his family seem to have been in straightened circumstancès. But the évidence also shows that Waggerman subsequently took Hall's note for the amount of these advances.

Attention is also called to Waggerman's conversation with Mrs. Hall and Mrs. Pleasants, her mother, in which he seems to admit that Hall still had an interest in "Bromo Seltzer." Hall himself testified that Waggerman told him at the time of his discharge and afterwards that his interest in the business remained intact. Waggerman denies this statement and says that the other conversation referred to occurred during Hall's connection with the house.

But the principal evidence relied upon to establish Waggerman's admission that Hall still had an interest under this contract is a letter dated February 4, 1892. In this letter Waggerman writes, "at present I am not in funds, and as to advancements on 'Bromo Seltzer,' we have a written agreement which you insisted upon having, and we will wait until that is faithfully carried out." But on cross-examination Mr. Waggerman explains the meaning of this letter. When asked if it was true, as he had stated in his answer and testimony,. that Hall had been divested of his interest in the business by his discharge, and so understood between them, "why did he write you for money on account of Bromo Seltzer?" Answer—"because he always thought he had not been properly discharged, and he was waiting for me to get my money out, so that he might make some deal with me."

When asked why he did not state in his letter that Hall had been divested of his interest, Waggerman re· plied : "I wanted to give him a chance to see if the construction could be put upon it that he was improperly discharged by Dr. Emerson. I did not want to divest him of any of his rights." When again asked why he did not state the fact in his letter that Hall's interest was gone, the witness replied, "because he (Hall) simply wanted the information as to when I got my $10,000, so that, if he was not properly discharged, he would have some recourse." And again the witness was asked what he meant by "We have a written agreement which you insist upon having, and we will wait until that is faithfully carried out," and if he meant that he would wait until he got his $10,000, back replied, "Yes, sir ; and if he had any grievance against me, he could bring suit and show whether he had been improperly discharged and been treated unfairly."

But, assuming that Waggerman really supposed that Hall's interest in the business under their contract still continued, is the Court bound to accept his construction when the contract is plain and· clear, and speaks unmistakably for itself? I can readily conceive of a case in which acquiescence in the construction of a contract, by means of which a party derives a benefit, may estop him from afterwards denying it. But in this case the benefits seem all to have been on Hall's side—certainly not on Waggerman's. Or where a contract is ambiguous and uncertain, and the parties to it place a construction upon it, it ought to have, and the cases decide that such construction will have great weight with the Court. But the cases in this State, so far as I have examined them, go no further, and· the weight of authority, indeed the unbroken authority, seems to be that when the meaning of a contract is clear, an erroneous construction by the parties will not control.

Brantly's Law of Contracts, 183.

In Stockham, garnishee, vs. Stockham, 32 Md. 209, the Court said "it is well settled that a Court cannot be aided in the construction of any agreement by the acts which the parties

may have done under it, nor is a party bound by any construction which he may have put on the instrument."

In Citizens' Fire Ins. Co. vs. Doll, 35 Md. 107, Alvey, J., delivering the opinion of the Court said: "Although it is very true, as contended by the appellee, that when an agreement is plain and free from all ambiguity, it will not be construed by the acts and admissions of the parties in reference to it, yet where the intention is obscure or doubtful and extrinsic evidence can be invoked, no evidence is more reliable or entitled to greater consideration, as manifesting what the intention was, than the acts and conduct of the parties themselves.

As was said by the Superior Court in Railroad Co. vs. Trimble, 10 Wall. 367, where there is a doubt as to the proper meaning of an instrument, the construction which the parties to it have themselves put upon it is entitled to great consideration; but where its meaning is clear, an erroneous construction of it by them will not control its effect. The same principle of construction was fully stated by Chief Justice Shaw in the case of Fogg vs. Middlesex Fire Ins. Co., 10 Cush. 337."

I have read the contract between Waggerman and Hall with great care and I am wholly unable to discover any ambiguity or doubt such as would justify a Court in resorting to the construction of the parties themselves for the true interpretation, even if the proof was clear that the defendant, Waggerman, concurred in any such construction.

It certainly provides as clearly as language can make it, that if Hall "incurs the dissatisfaction of the firm then this agreement upon thirty days notice to said party," &c., "shall terminate as to said *salary employment, and also as to any further interest in said firm; and said party (Hall) shall have no future interest in said business or under this contract."* Having found that Mr. Hall incurred the dissatisfaction of the firm and was discharged by both partners for that reason, receiving his salary for thirty days after his duties ceased, I am unable to see what further interest he has under the terms of his agreement, either as to salary or profits, or in any other particular.

It is not pretended that there was a new promise by Waggerman to Hall after the latters discharge, nor could such a promise be enforced, there being no consideration to support it. The plaintiff avers that he relies upon the contract, and as we understand it, he is without a case.

One other question remains to be disposed of. The complainant insists that even assuming that he was discharged by the firm, and that the effect of such discharge was to terminate his interest in the business, that he is nevertheless entitled to have his one-quarter interest ascertained as of that date, and that such interest embraces not only the net profits of the concern, but also the trade mark and all other partnership property.

There can be no doubt that if Waggerman had at that time been reimbursed, as the contract provides, and any profits had accrued to the firm that Hall would be entitled to his share as of that date, "calculated upon the theory that the said party of the second part has a one-quarter interest in said business, subject to the prior claim or lien, &c." But that is all. Waggaman obligates himself to pay to Hall "one-quarter of the *net profits* of said business in the same manner as if he were an equal partner, &c." But it is conceded that at the time of Hall's discharge, and in January, 1891, when Waggerman recalled his authority to act for him as his agent, there were no net profits. On the contrary, the concern was losing money, and Waggerman had paid in only part of the $10,000 he was to contribute.

I do not think Mr. Hall can by any possible construction be held entitled to have the value of the trade mark ascertained and one-quarter of it awarded to him.

It was partnership property, not net profits, and not covered by Mr. Hall's interest, under the contract. The plaintiff's bill must therefore be dismissed.